## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JIMMY TAFOYA,**

> **Plaintiff,**

**vs.**                                                           **Civil No. 02-0043 LH/RLP**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

> **Defendant.**

### UNITED STATES MAGISTRATE JUDGE'S
### ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.      Plaintiff, Jimmy Tafoya ("Plaintiff" herein) invokes this Court's jurisdiction under 42 U.S.C. §405(g), seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner). The Commissioner determined that Plaintiff was not eligible for disability insurance benefits at any time prior to the date he was last insured. Plaintiff moves this Court for an order reversing the Commissioner's final decision and remanding for payment of benefits, or in the alternative, to remand for rehearing. The Court will review the Commissioner's decision to determine whether her findings are supported by substantial evidence and whether she applied correct legal standards in making her findings. Williams v. Bowen, 844 F.2d 748 (10th Cir. 1988).

### Administrative History.

2.      Plaintiff was injured in a job site accident on June 19, 1987. He has filed three separate applications for disability benefits. The first application, filed in 1989, was denied administratively

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 29 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections withing the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

and not appealed.  A second application was filed on February 22, 1991.[2]  The denial of that application was appealed to the District Court for the District of New Mexico, and was remanded on motion by the Commissioner for additional proceedings.  A third application was filed while proceedings pertaining to the second application were pending before the District Court.  The third application was granted administratively, and Plaintiff was awarded benefits effective August 1992.  A second administrative hearing involving the second application was held in April 1994.  That claim was again denied by an ALJ on January 26, 1995.  Plaintiff sought review by the Appeals Council which assumed jurisdiction on April 5, 1996.  In addition to reviewing the denial of the second application, the Appeals Council proposed reopening and reversing the administrative approval of Plaintiff's third application. On June 28, 1996, the Appeals Council determined that Plaintiff had not been under a disability at any time on or prior to December 31, 1992, when he was last insured for benefits.  The Appeals Council's decision was appealed to the District Court.  On May 13, 1997, the matter was again remanded to the Commissioner by agreement of counsel for further development of the record.[3]  A third administrative hearing was conducted on August 28, 1998, and February 23, 1999.  The ALJ received testimony from Plaintiff, a medical consultant and a vocational expert.  The ALJ denied Plaintiff's consolidated applications in a decision dated October 7, 1999.  The Appeals Council declined jurisdiction on December 8, 2001.  The decision of the ALJ therefore became the

---

[2]If found disabled as of the alleged onset date, Plaintiff would be entitled to disability insurance benefits only up to 12 months prior to the filing of his second application, or February 22, 1990.  See §42 U.S.C. 423(b) and §20 C.F.R.  404.621(a)(1)(i).

[3] The remand order vacated the ALJ's order denying Plaintiff's third application, vacated the Appeals Council's order finding that Plaintiff had not been under a disability, affirmed the reopening of the third application, consolidated the second and third applications and required additional proceedings before an ALJ to hear and re-evaluate "whether [Plaintiff] was under a disability at any time on or prior to December 31, 1992."  (Tr. 564-565).

final decision of the Commissioner for judicial purposes.

## Issue Presented

4.     I will address Plaintiff's contention that the ALJ's findings regarding Plaintiff's residual functional capacity, and the hypothetical questions based upon those findings, were not supported by substantial evidence and were reached utilizing incorrect legal standards.

## Discussion

5.     "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir.1993) (citation omitted). The Commissioner has established a five- step sequential evaluation process for determining whether a claimant is disabled. Id. Here, the ALJ denied benefits at step five. At step five, a claimant has established that he has a severe impairment which prevents him from returning to his past relevant work, and "the burden shifts to the [Commissioner] to show that the claimant retains the residual functional capacity (RFC) to do other work that exists in the national economy." Id. at 1487.

6.     Residual functional capacity is what an individual can still do despite his or her impairments. 20 C.F.R. §1545(a). It involves a "function-by-function assessment," Social Security Ruling 96-9p, 1996 WL 374185, at *2, which includes a claimant's ability to sit, stand, and walk, his manipulative and postural functions, see 20 C.F.R. §404.1545(b), as well as his mental limitations and restrictions. 20 C.F.R. §404.1545 (c). Responsibility for determining residual functional capacity lies with the Commissioner, 20 C.F.R. §404.1527(e)(2), who is to consider all relevant evidence. 20 C.F.R. §404.1545(a).

7.     In addressing Plaintiff's physical condition, the ALJ found:

> . . . that [Plaintiff] has a residual functional capacity for sedentary/light work activity. Specifically during the period under review, he was limited to lifting and/or carrying 25 pounds on an occasional basis, 10 pounds more frequently; sitting a total of five hours during an eight hour day, one hour at a time; and standing and/or walking for a total of three hours in an eight hour day, one hour at a time. During that time [Plaintiff] also had nonexertional limitations, which further limited the kinds of jobs he could perform. Claimant was limited to climbing steps only occasionally and less stooping and bending. He could not perform jobs that required balancing, crouching, kneeling or crawling; or jobs that would expose im to extremes of cold or dampness or excessive vibration.

(Tr. 555).

8.     The ALJ utilized two functional capacities evaluations in determining Plaintiff's physical residual functional capacity, an April 1988 evaluation by Mary Lou Langford, a physical therapist, and a March 1992 evaluation by Emmet Thorpe, M.D., an orthopedic surgeon.[4] (Tr. 556). Plaintiff argues that the ALJ erred by relying on Ms. Langford's evaluation, because she is not a "acceptable medical source." (Docket No. 11, at 7). "Acceptable medical sources" are defined in 20 C.F.R. §404.1513(a), and include licenced physicians, psychologists, optometrists, podiatrists and qualified speech-language pathologists. Ms. Langford, a licenced physical therapist, does not meet the definition of an "acceptable medical source." She is, however, an "other source" as defined in 20 C.F.R. §404.1513(d) from whom the Commissioner may obtain evidence.

9.     The ALJ also relied on an evaluation by Dr. Thorpe, who is an acceptable medical source. A comparison of the ALJ's RFC findings with the conclusions of Ms. Langford and Dr. Thorpe reveals that most of the limitations accepted by the ALJ came directly from Dr. Thorpe's evaluation. (See Appendix A). The ALJ diverged from Dr. Thorpe's evaluation only as to the amount of time

---

[4]Ms. Langford's and Dr. Thorpe's detailed evaluations are found at Tr. 202-211 and Tr. 330-342.

Plaintiff could stand/walk continuously, concluding that he could do so for one hour, rather one-half hour. The hypothetical questions the ALJ actually posed to the Vocational Expert, which formed a basis for the ALJ's conclusions at Step five of the sequential evaluation process, utilized the restrictions contained in Dr. Thorpe's report, including a limitation of one-half hour of continuous standing or walking.  (Referring to Ex. 23, at Tr. 340-341;  See Tr.690-691).  Accordingly, I find no error in the ALJ's conclusions as to Plaintiff's physical RFC.

10.     In addition, the ALJ noted that the limitations assigned by Dr. Thorpe and Ms. Langford were generally consistent with Plaintiff's own evidence.  (Tr. 551).  For example, Plaintiff advised Dr. Thorpe that he could sit as long as he had do, that lifting of 25 pounds on an occasional to frequent basis was not a problem, that walking or standing for an hour aggravated his pain complaints, but that he could walk for half an hour with discomfort.  (Tr. 337).

11.     Based on the foregoing, I find that substantial evidence supports the ALJ's physical residual functional capacity evaluation during the time under review.

12.     In addition to his physical impairments Plaintiff also has "severe" mental impairments.  A severe mental impairment is a nonexertional limitation that must be considered by the Commissioner if there is evidence to support the existence of the impairment.  Cruse v. U.S. Dep't of Health &Hum. Serv., 49 F.3d 614, 619 (10th Cir.1995); Hargis v. Sullivan, 945 F.2d 1482, 1491 (10th Cir. 1991); Williams v. Bowen, 844 F.2d 748, 752 (10th Cir. 1988).  The ALJ stated:

> -- "The evidence from all the experts establishes that Claimant is functioning with low average to borderline intelligence.  There is also substantial evidence that Claimant has a learning disability, which has resulted in very poor reading, writing, and arithmetic skills.  Dr. Morgan, in fact, found that Claimant is functionally illiterate." (Tr. 547).

-- "[A]ll testing in the record and [Plaintiff's] testimony at the hearing suggest that his

reading, writing and arithmetic skills are very low, third to fourth grade level" (Tr. 556), and

-- "Claimant has had a "severe" impairment or combination of impairments (including) low

average to borderline intellectual function. . . .Claimant was limited by his mental impairments

to unskilled work that did not require complex reading, writing or arithmetic." (Tr. 558).

When both exertional and nonexertional impairments diminish a claimant's RFC, the Commissioner

must produce expert vocational testimony or other similar evidence to establish the existence of jobs

in the national economy." Cruse v. U.S. Dep't of Health & Hum. Serv., 49 F.3d 614, 619 (10th Cir.

1995). Plaintiff contends that once his mental limitations are considered, he does not have the

residual functional capacity for the two jobs identified by the Vocational Expert as within his

capabilities, small products assembler and surveillance system monitor.

13.    Plaintiff's intellectual functioning was evaluated by Dr. Foote, a forensic psychologist, in

1988-1989 (Tr. 434-446), by Helen Kirkpatrick, M.A., a psychological, career and vocational

counselor in 1992 (Tr. 7-10), by Charles Bradshaw, PhD, in 1993 (Tr. 407-416) and by Clifford

Morgan, PhD, in 1998. (Tr. 611-621). All evaluators found noted that Plaintiff had limited

intellectual functioning, although as noted by the ALJ, the lowest IQ scores, obtained by Dr.

Bradshaw, were not consistent with results measured by the other testers.[5] Based on objective

testing, Dr. Foote found that Plaintiff's reading, writing and arithmetic proficiency was between 3rd

| [5] | Foote | Kirkpatrick | Bradshaw | Morgan |
|---|---|---|---|---|
| Verbal IQ: | 74 | 80 | 65 | 76 |
| Performance IQ: | 84 | 74 | 79 | 85 |
| Full Scale IQ: | 78 | 81 | 70 | 80 |

(Tr. 435, 7-8,412, 616, 545).

and 5th grade levels. (Tr. 435). Ms. Kirkpatrick administered achievement tests which indicated that Plaintiff could read at the lower 5th grade level, spell at the end of the 3rd grade level and do arithmetic at the lower 7th grade level. (Tr. 7). Dr. Bradshaw did not objectively test Plaintiff's reading proficiency, instead basing his conclusion that Plaintiff read at a 3rd grade level on interview only. (Tr.412). He indicated, however, that despite his poor reading ability, Plaintiff was able to follow very simple written directions, and could follow one or two simple steps at a time if directions were simple and repeated. Dr. Morgan administered achievement tests which indicated that Plaintiff's proficiency in reading, writing and arithmetic were at the 4th grade level. (Tr. 611,616). In terms of functional limitations, Dr. Morgan indicated that Plaintiff had no limitation in understanding and remembering very short and simple instructions, mild limitations which did not significantly affect his ability to work without supervision, interact appropriately with the public, co-workers and supervisors and be aware of and react appropriately to normal hazards, and moderate limitation in his ability to understand and remember detailed or complex instructions, carry out instructions, attend and concentrate and adapt to changes in the workplace. Tr. 620-621.

14.     Dr. David Ewing, a psychiatric medical consultant present at the final administrative hearing, testified that Plaintiff had borderline intellectual functioning and learning disabilities, with "quite a fair amount of problems with verbal, analytical" functioning. (Tr. 674-675).

15.     Karen Provine, a vocational expert ("VE" herein) testified at the administrative hearing. The VE was asked to consider an individual possessing Plaintiff's vocational and educational profile, who was functionally illiterate, reading at the 3rd or 4th grade level, with physical limitations as described by Ms. Langford and Dr. Thorpe, and IQ levels as measured by Dr. Morgan (VIQ 76, PIQ 85, FSIQ 80). In addition, she was asked to assume that the individual *would be unable to follow detailed*

*instructions or written instructions*, got along okay with people, but would have moderate difficulty adapting to changes in the workplace.  (687-693).  The VE  testified that such an individual would be able to perform the jobs of small products assembler and surveillance systems monitor as defined by the Dictionary of Occupational Titles ("DOT" herein).  (Tr. 691, 693).

16.     Plaintiff correctly points out that the job of small products assembler requires the ability to "apply commonsense understanding to *carry out detailed but uninvolved written or oral instructions. . .*" DOT, §706.684-022, Assembler, Small Products I, 4th Ed., Revised 1991. (emphasis added). The job of surveillance system monitor, as defined by the DOT, also requires the ability to carry out detail, uninvolved written or oral instructions, with additional and more complex problem solving, reading and writing requirements.  DOT, §379.367-010, Surveillance-System Monitor, 4th Ed., Revised 1991.  The ability to carry out detailed or written instructions was excluded under the hypothetical posed by the ALJ.

17.     The VE's testimony, therefore, conflicts with the provisions of the DOT.  In such a situation, the VE's testimony may still constitute substantial evidence,  provided the ALJ inquires of the expert "how his or her testimony as to the . . . requirements(s) of the identified jobs corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point."  Haddock v. Apfel, 196 F.3d 1084, 1087 (10th Cir. 1999).

18.     In Daniels v. Apfel, 225 F.Supp.2d 1234, 1240-1241 (D. Colo. 2002), a VE was asked to explain the differences between his testimony and the DOT job descriptions.  He stated his conclusions were "just from observation and job analyses" performed two or three years earlier on two of three jobs listed.  The ALJ denied the claimant's request that the VE produce the studies upon which his conclusions were based.  The court found that "(u)nder these circumstances, the ALJ 'failed

8

to elicit a reasonable explanation' for the conflict between the VE's testimony and the job requirement stated by the DOT." Daniels, 225 F.Supp. 2d at 1241.  In this case, absolutely no explanation was sought or provided as to the discrepancy between DOT requirements and the VE conclusions.[6]

Recommended Disposition

19.    Plaintiff's claims for benefits have been pending for almost twelve years, through numerous administrative and judicial proceedings.  The Commissioner is not entitled to adjudicate a case "ad infinitum until (she) correctly applies the proper legal standard and gathers evidence to support (her) conclusion." Sisco v. United States Dep't of Health & Human Servs, 10 F.3d 739, 746 (10th Cir. 1993), quoting Thaete v. Shalala, 826 F.Supp. 1250, 1252 (D. Colo. 1993).  It is not clear whether disability income benefits awarded in connection with Plaintiff's third application have continued to be paid. If those benefits have continued to be paid,  I recommend that this case be remanded to the Commissioner with instructions to formally award those benefits.  If those benefits have been discontinued, I recommend that this case be remanded to the Commissioner with instructions for an immediate award.

RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE

---

[6]Although the VE discussed the impact of designated reading levels on specific vocational preparation (SVP) for the two jobs listed, she did not address, nor was she asked to address, the impact of Plaintiff's inability to  carry out detailed instructions or written instructions.

Appendix A

| | Langford 4/88 Tr. 208-209 | Thorpe 3/92 Tr. 340-341 | ALJ Tr. 555 |
|---|---|---|---|
| Lifting/carrying | Lift:  22 lb. frequently 26-50 lb. occasionally Carry:  up to 50 lb. occasionally | 25 lb. occasionally 10 lb. frequently | 25 lb occasionally 10 lb frequently |
| Sitting | 7 hours in 8 hour day, 3 hours at a time | 5 hours in 8 hour day, 1 hour at a time | 5 hours in 8 hour day, 1 hour at a time |
| Standing/walking | Stand: 3 hours in 8 hour day, 1 hour at a time Walk: 2 hours in 8 hour day, ½ hour at a time | 3 hours in an 8 hour day, ½ hour at a time | 3 hours in 8 hour day, 1 hour at a time |
| Climbing | Occasionally | Occasionally - steps Never - ladders | Occasionally |
| Stooping/ bending | Bending:  frequently | Once an hour, but less than 1/3 of day | less than occasionally |
| Balancing | | Never | Never |
| Crouching | | Never | Never |
| Kneeling | | Never | Never |
| Crawling | Never | Never | Never |
| Squatting | Occasionally | | |
| Exposure to extreme of cold, dampness  or excessive vibration | | would increase symptoms | Never |

10